Civil Action No. _21-2021___

ESTATE OF APRIL BLACKMON-LOGAN, BY AND THROUGH ITS PERSONAL REPRESENTATIVE KATHY ANN LEE, and

CHRISTOPHER MISERLIAN, Individually;

Plaintiffs,


v.


THE ADAMS COUNTY SHERIFF'S OFFICE,

ADAMS COUNTY SHERIFF'S DEPUTY CHAD JENKINS, in his Individual and Official Capacity,

ADAMS COUNTY SHERIFF RICHARD REIGENBORN, In his Individual and Official Capacity,

BOARD OF COUNTY COMMISSIONERS OF COUNTY OF ADAMS, COLORADO,

KALCEVIC LAND COMPANY,

SEVEN T. FARMS, LLC,

PHILLIP TRUJILLO, Individually,

COLORADO DEPARTMENT OF TRANSPORTATION,

LEAH FORD Individually, by and through the ESTATE OF LEAH FORD,

MICHAEL LINNEBUR,

Defendants.

## COMPLAINT AND JURY DEMAND

COMES NOW the above-named Plaintiffs, by and through their attorneys, The Bourassa

Law Group, and state and allege the following:



## JURISDICTION AND VENUE

1. This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution and is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and the Fourteenth Amendment to the Constitution of the United States.

2. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331, 1343, and 1367. Jurisdiction supporting Plaintiff's claims for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

3. This case is instituted in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391 as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices and/or reside.

4. Supplemental pendent jurisdiction is based on 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

5. The state law claims arise from the following statutes, included but not limited to

6. : C.R.S. § 13-21-201, C.R.S. § 13-21-202, C.R.S. § 13-21-203, C.R.S. § 24-10-106(1)(b), C.R.S. § 24-10-118(2), C.R.S. § 13-20-101.

7. Plaintiffs properly notified Defendants of their claims pursuant to C.R.S. § 24-10-109 on September 9, 2019 to Defendant Adams County, Defendant Adams County Sheriff's Office, and Defendant Colorado Department of Transportation.

8. Pursuant to the Colorado Governmental Immunity Act, sovereign immunity is waived for Plaintiffs' state law claims against the government defendants under C.R.S. § 24-10-106(1)(b) and (e).

9. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this litigation.

## PARTIES

**Plaintiffs:**

10. Plaintiff Kathy Ann Lee, is the grandmother of the decedent, a resident of the State of Colorado, and a citizen of the United States of America, and the Personal Representative of the Estate of April Blackmon-Logan.

11. Plaintiff Christopher Miserlian is the decedent's biological father. He is at all times relevant to this action, a citizen of the United States of America.

12. At all times relevant to this action, decedent April Blackmon-Logan was a citizen of the United States of America and a resident of the State of Colorado. She was unmarried adult with no children.

**Defendants:**

13. Defendant Adams County Sheriff's Office ("Defendant ACSO" or "the Department") is operated by Adams County, a political subdivision of the State of Colorado, established and maintained by the laws and Constitution of the State of Colorado, which employed Defendant Deputy Chad Jenkins at all times relevant to this action. The Adams County Sheriff's Office maintains a substation located at 4201 East 72nd Avenue, Unit C, Commerce City, Colorado 80022.

14. Plaintiffs are informed and believe, and thereon allege, that at all times relevant to the subject matter of this action, Defendant Adams County Sheriff's Deputy Chad Jenkins ("Defendant Jenkins") was a citizen of the United States and a resident of Colorado, employed by the Defendant Adams County Sheriff's Office, and was acting under color of state law, and within the course and scope of his employment.

15. Plaintiffs are informed and believe, and thereon allege, that at all times relevant to this action, Defendant Adams County Sheriff Richard Reigenborn ("Defendant Reigenborn") was a citizen of the United States and a resident of the State of Colorado. At all relevant times, Defendant Reigenborn was acting under the color of state law in his capacity as the Adams County Sheriff. Defendant Reigenborn was responsible for training and supervising Defendant Jenkins, and all other employees of the Adams County Sheriff's

Office, for setting policies and procedures of for the county Deputies, overall management of the Sheriff's Office, and for ensuring the health and welfare of all persons detained by the Adams County Sheriff's Office. Defendant Reigenborn was charged with enacting, implementing and/or enforcing policies and procedures of the Sheriff's Office, including those policies and procedures involved in this action. Defendant Reigenborn is the final policy maker for the Adams County Sheriff's Office, who at times delegated his authority to Adams County employees such as Defendant Jenkins.

16. At all times relevant to this action, Defendant Board of County Commissioners of County of Adams Colorado ("Defendant Adams BOCC") is the statutory head of Adams County; a political subdivision of the State of Colorado, established and maintained by the laws and Constitution of the State of Colorado, the public entity responsible for Adams County and the Adams County Sheriff's Department, with a duty to supervise and direct the policies and procedures of the Defendant Adam's County Sheriff's Office. The Board of County Commissioners of County of Adams Colorado is the proper entity to be named as a Defendant under 42 U.S.C. § 1983.

17. Defendant Kalcevic Land Company ("Defendant Kalcevic") is a Colorado Corporation registered in good standing with the State of Colorado with a principal office street address of 4730 Calhoun Byers Road, Byers, Colorado 80103.

18. Defendant Seven T Farms, LLC ("Defendant Seven Farms") is a Colorado Limited Liability Company registered in good standing with the State of Colorado with a principal office street address of 630 Maple Street, Sanford, Colorado 81151, which employed Defendant Phillip Trujillo at all times relevant to this action.

19. Defendant Phillip Trujillo ("Defendant Trujillo") is a citizen of the United States and a resident of the State of Colorado, with a Colorado address of 712 State Street Antonito, Colorado 81120, and was employed by Defendant Seven T Farms and acting within the course and scope of that employment at all times relevant to this action.

20. Defendant Colorado Department of Transportation ("Defendant CDOT") is a statutorily established state agency of the State of Colorado and receives federal funding for oversight and maintenance of state and federal highways, and at all times relevant to this action, maintained control, oversight, and maintenance of the roadways and traffic signs and signals in the areas related to this action.

21. Defendant Leah Ford ("Defendant Ford"), deceased, by and through the Estate of Leah Ford, was at all times relevant to this action a citizen of the United States and a resident of the State of Colorado.

22. Defendant Michael Linnebur is a citizen of the United States and a resident of the State of Colorado at all times relevant to this action, with a Colorado address of 5440 Behrens Road, Byers, Colorado 80103.

## **FACTUAL ALLEGATIONS**

**July 26, 2019:**

23. Plaintiff incorporates by reference all paragraphs of this Complaint as though fully alleged herein.

24. On July 26, 2019, Defendant Jenkins ("Jenkins"), in uniform and on duty, made a traffic stop on a flatbed-commercial pickup truck owned by Defendant Kalcevic ("Kalcevic") and being driven by Michael Linnebur ("Linnebur").

25. Jenkins made the traffic stop of the vehicle driven by Linnebur due to a defective front headlight.

26. Kalcevic was the owner of the truck, and the employer of Linnebur, and gave permission to Linnebur to drive the flat-bed commercial truck.

27. Linnebur operated the flatbed-commercial truck to transport Leah Ford ("Ford") and her friend April Blackmon-Logan ("Decedent") to and from a trip to Elitch Gardens in Denver, Colorado for the evening.

28. Linnebur, as driver, and Ford and Decedent, as passengers, were on their way home from Elitch Gardens in Denver.

29. Jenkins pulled the flatbed-commercial pickup truck over at or about 11:22pm in a dark, isolated, remote area at or near the intersection of Imboden Road and 88th Avenue in Adams County, Colorado, in an area he knew, or should have known, had limited or no cellphone service.

30. There were no surrounding homes, other automobile traffic was almost nonexistent at that hour in that particular location, and the area was almost completely unilluminated.

31. After Linnebur obeyed the flashing lights of Jenkins' patrol vehicle, Linnebur pulled to a stop on the eastern shoulder of the northbound lane of Imboden Road. Jenkins came to a stop approximately ten (10) feet behind the flat-bed commercial truck.

32. When Linnebur pulled to a stop, Jenkins requested Linnebur produce his driver's license, and the vehicle's registration and insurance information.

33. Linnebur responded that he did not have his license, and told Jenkins that the registration and insurance were contained in the glove compartment.

34. Jenkins did not ask for the registration and insurance, as he recognized both Linnebur as a person familiar to him and possibly the commercial flat-bed truck as belonging to

Kalcevic. Jenkins then left the side of the commercial flatbed truck and returned to his patrol car.

35. Linnebur was familiar to Jenkins as Jenkins had previously pulled over Linnebur for other infractions in the months prior to this instant interaction.

36. Jenkins ostensibly ran Linnebur's information through his department database, or at least used some communication tool to check on the status of Linnebur's driver's license.

37. When Jenkins returned to the truck, he ordered Linnebur to step out of the truck, which was still running. Jenkins did not at this point inform Linnebur that there was a warrant out for his arrest.

38. At that point, Jenkins informed Linnebur he had stopped him for a defective taillight.

39. Jenkins either ordered Linnebur to try to fix the taillight or granted permission to Linnebur to attempt to fix the taillights on the side of the road during the traffic stop.

40. When Linnebur did not repair the taillights to the satisfaction of Jenkins, Jenkins advised Linnebur that there was a warrant for his arrest on a failure to appear on minor traffic violation.

41. At that point, Jenkins took Linnebur into custody, handcuffed him, walked him in handcuffs to his patrol car and then placed him into the patrol car.

42. Jenkins performed his arrest and placement of Linnebur in custody in full view and hearing of Ford and the Decedent.  Jenkins did not explain to Ford and the Decedent what he was doing, why it was necessary, or why he was exercising his police authority and placing Linnebur in restraints and into custody in his patrol car.

43. After his obvious display of custodial arrest, Jenkins returned to the defective flatbed-commercial truck.

44. Jenkins did not request driver's license information or any other identifying information from either Ford or the Decedent.  Jenkins did not run either parties' information through his department database or any other communication tool to check on the status of either Ford or the Decedent.

45. Instead, Jenkins reportedly instructed Ford and the Decedent on how to engage the emergency flashers on the defective flatbed-commercial truck, and further instructed them on how to engage the high beams to override the defective headlights for which they had just been pulled over.

46. Jenkins also instructed Ford and the Decedent to disengage the high beams if and when they saw oncoming traffic.

47. Jenkins took the foregoing actions with the intent to create a deceptively false sense of security in both Ford and the Decedent, to give them confidence that the defective flatbed-commercial truck was safe to drive – even at night with non-working headlights and taillights – and then ordered Ford and the Decedent to drive the defective flatbed-commercial truck home after intentionally creating the illusion of a safe vehicle.

48. Jenkins failed to inspect the condition of the defective flat-bed commercial truck.

49. Jenkins further failed to confirm the driver's licenses of Ford and the Decedent and failed to allow Ford or the Decedent to use his communications equipment to contact their families and failed to consult with his Department's dispatch to secure a safe vehicle to transport Ford and the Decedent home or to an alternative safe location.

50. Jenkins failed to call for assistance from his Department's dispatch or from either parties' families to secure that Ford and the Decedent would be taken home safely.

51. Jenkins took the foregoing actions with the intent to create a deceptively false sense of security in Ford and the Decedent, in conjunction with his loud display of police authority, and to give them the false sense that they could safely find their way home in a defective flatbed-commercial truck.

52. At no time during the traffic stop, subsequent arrest of Linnebur, and ordering Ford and the Decedent to drive the defective flatbed-commercial truck did Jenkins warn the parties of the dangers of night driving, the condition of the dangerous nearby intersection, the dangers of driving a vehicle with defective headlights at night, the dangers of disengaging the high beams and consequently missing obstructions, signage or other vehicles, or the danger s od driving a defective vehicle without experience or training.

53. On the information and belief, Jenkins selected and ordered Ford to be the driver, although neither Ford nor the Decedent were licensed to drive, and although Jenkins did not check the status of whether either party possessed a valid driver's license.

54. Ford dutifully followed Jenkins' order, and according to his order, took the driver's seat of the still running defective flatbed-commercial truck, preparing to drive her and the Decedent home.

55. After ordering the parties to drive home, Jenkins returned to his patrol car and was informed by Linnebur before Ford and the Decedent drove off that neither Ford nor the decedent knew where they were, giving Jenkins notice of their complete unfamiliarity with the location and roads. Jenkins ignored Linnebur.

56. Ford and the Decedent obeyed Jenkins' order, and drove off, almost immediately performing a U-turn in the middle of the road and proceeding in the opposite direction.

57. After a short period, Jenkins drove off with Linnebur in custody, then parked his patrol car a short distance away where he met with a fellow deputy for twenty (20) minutes.

58. Meanwhile, Ford proceeded to drive the defective flatbed-commercial truck down a dark and poorly signed road.

59. Minutes later, as the deputies were still meeting on the side of the road, Ford and the Decedent approached the intersection of East 88th Avenue and Highway 79 – a notoriously dangerous intersection with little to no illumination and nearly invisible signage.

60. Apparently not seeing a stop sign, being unfamiliar with night driving, being unfamiliar with the defective flatbed-commercial truck, and being inexperienced at a driving in general and unlicensed, Ford missed a stop, entered the intersection, and the parties were hit by a commercial tractor trailer driven by Phillip Trujillo traveling 60 miles per hour at or around midnight.

61. Phillip Trujillo was driving a commercial tractor trailer under the ordinary course and scope of his employment with Seven Farms when he struck and killed Ford and the Decedent.

62. The impact of the collision caused the bed of the flatbed-commercial truck to be sheared from the cab. The cab rolled one and a half times before coming to rest on its roof with nearly three feet of "intrusion" into the passenger compartment.

63. The Decedent was ejected on impact and was eventually found face down in the road. Ford was crushed by the cab collapsing as it rolled over and died from compression asphyxia, blunt force injuries, and a spinal cord contusion.

64. After the death of the parties, it was determined that Ford was the driver, and the Decedent was the passenger at the time of their deaths.

65. At no time before ordering Ford and the decedent to drive the defective flatbed-commercial truck home did Jenkins (i) ascertain where their homes were, (ii) check for valid licenses of either Ford or the Decedent, (iii) check for ownership of the vehicle by examining the registration, or (iv) check for valid insurance.

66. Jenkins recklessly failed to check for valid registration or valid insurance for the flatbed-commercial truck; had he done so, he would have found that Linnebur was not the owner of the truck, and neither were either Ford or the Decedent.

67. Jenkins recklessly failed to verify driver's licenses for Ford or the Decedent, neither of whom had valid driver's licenses, and neither of whom were adequately trained to drive any vehicle, much less a defective commercial flatbed truck.

68. Jenkins recklessly failed to call for assistance from the Department or from either of the families of Ford or the Decedent in taking them home, and this despite the fact that a fellow deputy was merely minutes away and despite the fact that he intentionally ordered Ford and the Decedent to take the defective vehicle home, knowing that they did not know where they were.

69. Ford had no experience as a driver, and no experience driving a defective flatbed-commercial truck.

**Other Factual Allegations:**

70. The accident investigation subsequently revealed that – in addition to the defects known by Jenkins – the truck had dangerously mismatched and incorrectly inflated tires, and that the defective nature of the vehicle may have contributed to the death of Ford and the Decedent.

71. The overall defective condition of the flatbed-commercial truck, owned by Kalcevic, with defective headlights, taillights, and mismatched and incorrectly inflated tires likely contributed to the death of Decedent.

72. With simple observation, Jenkins could have and should have identified the further defects in the vehicle, as outlined above. Based on simple observation, and in the totality

of the circumstances presented before him, Jenkins should have ordered the parties to not drive the defective flatbed-commercial truck home.

73. Jenkins knew of the dangerous intersection where multiple deadly crashes had previously occurred, and he knew the truck was defective. Nevertheless, he knowingly ordered the inexperienced, unlicensed girls to drive home in an unfamiliar and defective vehicle at midnight, and recklessly sent them to their death.

74. Decedent's death is also directly related to the Department's inadequate training of their employees.

75. Upon information and belief, the Department has no written, formal policy regarding inquiry into a party's driver's license status or confirmation of same during traffic stops.

76. Upon information and belief, the Department has no written or official policy with respect to inspecting defective vehicles during traffic stops or any policy enduring the safety of drivers and passengers following a traffic stop.

77. Upon information and belief, the Department trains its employees that an officer requesting identifying information from a passenger during a traffic stop, for example requesting a driver's license, would constitute a violation of that passenger's constitutional rights, and thus officers are trained to not ask for any identifying

information from a passenger, even if that information would be vital for the safety of that party and any others.

78. The Department also trains its employees that they may only request personal verifying information, such as information to confirm licensure, only if the person is a victim of a crime or a target of a criminal investigation.

79. The Department's policy and training amounts to a deliberate indifference to the rights of persons such as Decedent, by failing to acknowledge, recognize, or address the importance of not allowing unlicensed drivers to operate vehicles, and more particularly under the specific circumstances involved in the traffic stop of a defective flatbed-commercial truck in which Decedent was an innocent passenger.

80. The Department's failure to instill policies and training in requesting and confirming a party's licensure status increases the likelihood of unlicensed drivers operating motor vehicles, and decreases public safety, and is contrary to public policy and standard law enforcement practice and procedures.

81. Decedent's death was completely preventable but for the actions and inactions of several of the Defendants mentioned above, including but not limited to Jenkins, Linnebur, Ford, Trujillo, Seven Farms and Kalcevic.

**FIRST CLAIM FOR RELIEF**

**Violation of 42 U.S.C. § 1983 Under the Fourteenth Amendment**

82. Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

83. Jenkins is a state actor who at all times relevant to the allegations of this Complaint was acting under color of state law pursuant to the policies of the Department.

84. Jenkins, in the exercise of his official power and ability to order citizens to take certain actions, and in ordering Decedent to drive home, denied Decedent her substantive due process.

85. In recklessly trying to create the impression of a safer vehicle by engaging flashers and in recklessly ordering Decedent to drive home in a defective flatbed-commercial truck, Jenkins knew was defective and dangerous to drive, he deprived Decedent of a liberty interest by creating or increasing the danger of private violence, and by increasing Decedent's vulnerability to injury or death.

86. This increased danger was in placing an inexperienced, unlicensed, and untrained driver on a known dangerous road in a known defective vehicle in obviously dangerously dark conditions.

87. This utter failure of Jenkins to protect the Decedent, which is the foundation of law enforcement, is conscience shocking.

88. Jenkin's conduct was a proximate cause of the Decedent's agonizing death and has caused the Estate to suffer significant damages and losses.

89. Jenkins was also deliberately indifferent to a substantial risk of serious risk to the Decedent, which consisted, *inter alia*, in the following:

   a. Deliberately refusing to check the licensure status of Ford despite the obvious substantial risk of serious harm;

   b. Deliberately refusing to take safety precautions with the defective vehicle, such as inspecting the vehicle, despite the obvious substantial risk of serious harm;

   c. Deliberately ordering Ford to drive a defective flatbed vehicle without confirming her licensure status, despite the obvious substantial risk of serious harm;

   d. Deliberately ordering the Decedent to ride as passenger with Ford as driver on a known dangerous road in a known defective vehicle in obviously dangerously dark conditions, despite the substantial risk of serious harm;

   e. Refusing to find an alternative to ensure the safety of the Decedent such as contacting the Department for an alternate mode of transportation or allowing Decedent to contact her family for safe transportation home.

90. As a direct result of each of Jenkins' deliberate indifference, the Decedent was injured and damaged in the following particulars:

   a. Loss of life, physical and mental pain and suffering, anxiety and stress, distress, and the loss of the chance to live a full and productive life;

b. Loss of future income and/or earning capacity;

c. Medical, burial, transport costs, and funeral expenses.

91. The conduct of Jenkins constitutes reckless and callous indifference to the Decedent's health, safety, and welfare entitling her Estate to punitive and exemplary damages against Jenkins in his individual capacity under color of state law.

## SECOND CLAIM FOR RELIEF

**Municipal Liability Against ACSO, Reigenborn, Adams BOCC**

92. Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

93. The Decedent was detained by Jenkins and had a clearly established right under the Fourteenth Amendment to the United States Constitution to be free from punishment. Ordering Decedent to drive in a defective vehicle with an unlicensed driver was not rationally related to a legitimate governmental objective or was excessive with regards to that purpose. In addition, Jenkins was deliberately indifferent to a known substantial risk of serious harm as described *Supra*.

94. To the extent ACSO, Reigenborn and Adams BOCC delegated final policy making authority for traffic stop procedures, they are liable for the unconstitutional policies and customs employed by Jenkins pursuant to their nondelegable duties of providing public

safety. The unconstitutional policies of Jenkins became the policies or customs of the ACSO and the County (BOCC), and the County is liable if those policies or customs prove to be unconstitutional.

95. In addition, upon information and belief, the ACSO, Reigenborn and County knew they lacked any official policies regarding confirming the licensure status of parties in a traffic stop that may be asked to operate a motor vehicle and lacked policies regarding how a traffic stop involving a defective vehicle should be executed. The substantial risk of the absence of such policies and customs are obvious, and yet the ACSO, Reigenborn and Adams BOCC continue to operate in this vacuum of policies and customs. The County has thus ratified these actions.

96. At all times material, Defendants purposefully maintained unconstitutional policy, practice, and custom, including, among other things, the following:

    a. Purposefully refusing to check the licensure status of parties involved in traffic stops;

    b. Purposefully refusing to take safety precautions with the defective vehicles during traffic stops;

    c. Purposefully ordering parties to drive defective vehicles without confirming licensure status, despite the obvious substantial risk of serious harm;

    d. Deliberately ordering other parties to ride as passengers with unlicensed drivers in known defective vehicles in obviously dangerously dark conditions, despite the substantial risk of serious harm;

    e.   Directing or allowing employees such as deputies to engage in the behavior outlined above;

    f.   Directing or allowing deputies to fail to ensure the safety of those they have detained and the general public;

    g.   Refusing to investigate, correct, train, and reprimand unconstitutional behaviors, customs, and policies that resulted in serious harm to Decedent.

97. There was a widespread custom at Adams ASCO of not performing safety measure during traffic stops such as confirming licensure status and ensuring proper safety protocols for defective vehicles, despite the obvious substantial risk of serious harm to those parties involved in those particular situations and to the public safety in general.

98. Adams ACSO, Adams BOCC, and Reignenborn failed to enact and/or implement policies and procedures for traffic stops, licensure confirmation and defective vehicle safety measures. This failure was the result of the deliberate indifference to the known substantial risk of placing an unlicensed driver in a defective vehicle on a dangerous road, which was the moving force in whole or in part in causing Decedent's death. Defendants had actual or constructive notice that the failure to enact and/or implement and/or train staff to confirm licensure, prohibit unlicensed drivers from operating vehicles, and from preventing defective vehicles from entering the roadways after being stopped was substantially certain to result in a constitutional violation, and they consciously and deliberately chose to disregard that risk. There was a essentially a

complete failure to train and/or supervise, or training and supervision that was reckless pr grossly negligent that future misconduct was almost inevitable.

99. There are systemic and widespread deficiencies by multiple Defendants. The deficiencies were so widespread, purposeful and ubiquitous as to affect anyone who could have been subject to a traffic stop. The need for training, supervision, and adequate staffing of the ACSO deputies to avoid the risk of serious injury and death was obvious. Defendants purposefully failed to adequately staff and/or train and/or supervise its staff to provide those subject to traffic stops, including Decedent, with access to appropriate traffic stop measures, all of which was the moving force in causing Decedent's injuries and damages.

100. There was a direct and causal link between the constitutional deprivations as aforesaid, and the inadequate training, inadequate discipline and inadequate supervision, and/or unconstitutional policies or customs of the Defendants.

101. Each Defendant's conduct was a direct cause in whole or in part of Decedent's injuries and damages, which are indivisible, resulting in join and several liability.

102. As a direct result of Adams ACSO, Adams BOCC and Reigenborn's deliberate indifference to a serious risk of injury and death, Decedent was seriously injured and damaged as stated in Paragraph 90, *Supra*.

103. The conduct of Defendants constitutes reckless or callous indifference to Decedent's health, safety, and welfare entitling her Estate to punitive or exemplary damages under color of state law.

## THIRD CLAIM FOR RELIEF

**Negligence of Defendants Jenkins, Adams ACSO, Adams BOCC and Reigenborn Resulting in Wrongful Death**

104.     Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

105.     The Defendants were each negligent in contributing to the death of Decedent.

106.     Jenkins, Adams ACSO, Adams BOCC and Reigenborn had a duty to protect Decedent from the risks of ordering Decedent to be a passenger of a defective commercial vehicle with an unlicensed driver in dangerous conditions on a dangerous road.

107.     Jenkins, Adams ACSO, Adams BOCC and Reigenborn breached that duty.

108.     The breach of their duty caused the injuries and death sustained by Decedent.

109.     The breach of their duty caused the injuries and damages sustained by Plaintiff.

110.     Each Defendant is liable for their own acts of negligence that, in conjunction with the negligence of the other Defendants, caused Decedent's wrongful death

111.     Jenkins was acting in the course and scope of his employment and thus his negligence is imputed to Adams ACSO, Adams BOCC and Reigenborn.

112.     As a result of the negligence of Defendants, Plaintiff Miserlian has been injured and damaged in the following particulars:

    a. The loss of care, companionship and society of his biological daughter the Decedent;

    b. Non-economic damages consisting of mental anguish, grief, emotional distress, and loss;

c.  Plaintiff Miserlian reserves the right to seek exemplary damages after sufficient discovery has been completed.

## FOURTH CLAIM FOR RELIEF

### Negligence of Trujillo Resulting in Wrongful Death

113.    Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

114.    Trujillo owed to Plaintiff a duty to use reasonable care in the operation of the commercial tractor trailer he was driving.

115.    Trujillo breached the above referenced duty, including, but not limited to, by carelessly driving and failing to slow down to mitigate the severity of the accident, directly and proximately causing Decedent's death.

116.    As a direct, proximate, and foreseeable result of the negligence of Trujillo, Decedent sustained injuries.

117.    As a result of Trujillo's breach of the aforementioned duties, Plaintiff has incurred damages as set forth above in Paragraph 112, *Supra*.

## FIFTH CLAIM FOR RELIEF

**Negligence of Ford Resulting in Wrongful Death**

118.     Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

119.     Ford owed to Decedent a duty to use reasonable care in the operation of the vehicle she was driving.

120.     Ford breached the above referenced duty, including, but not limited to, by carelessly driving, directly and proximately causing Decedent's death.

121.     As a direct, proximate, and foreseeable result of the negligence of Ford, Decedent sustained injuries.

122.     As a result of Ford's breach of the aforementioned duties, Plaintiff has incurred damages as set forth above in Paragraph 112, *Supra*.


**SIXTH CLAIM FOR RELIEF**

**Negligence Per Se of Ford Resulting in Wrongful Death**

123.     Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

124.    When Ford operated the flatbed-commercial pickup truck in a careless and negligent manner, Ford was in violation of applicable municipal ordinances and statutes of the State of Colorado, including, but not limited to: C.R.S. § 42-4-1402 – Careless Driving; C.R.S. § 42-4-704 – Vehicle entering roadway; C.R.S. § 42-4-703 – Entering through highway—stop or yield intersection.

125.    Ford's actions caused the type of harm that these traffic laws were enacted to prevent, namely, the death of Decedent.

126.    Decedent was a member of the class for whose protection the above-mentioned statutes were enacted.

127.    The above-mentioned violations were the direct and proximate cause of the Plaintiff's injuries and damages as previously described.

128.    As a result of Ford's negligence, Plaintiff has incurred non-economic damages as set forth above.

129.    As a result of Ford's breach of the aforementioned duties, Plaintiff has incurred damages as set forth above in Paragraph 112, *Supra*.

## SEVENTH CLAIM FOR RELIEF

## Negligence of Linnebur Resulting in Wrongful Death

130.     Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

131.     Linnebur owed to Decedent a duty to use reasonable care in the use and operation of the flatbed commercial vehicle he was driving.

132.     Linnebur knew or should have known of the dangers of using and operating the flatbed-commercial truck he was using and operating.

133.     Linnebur breached the above referenced duty, including, but not limited to, by carelessly driving and operating a defective vehicle, directly and proximately causing Decedent's death.

134.     As a direct, proximate, and foreseeable result of the negligence of Linnebur, Decedent sustained injuries.

135.     As a result of Linnebur's breach of the aforementioned duties, Plaintiff has incurred damages as set forth above in Paragraph 112, *Supra*.

## EIGHTH CLAIM FOR RELIEF

## Negligent Entrustment of Kalcevic Resulting in Wrongful Death

136.     Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

137.     Defendant Kalcevic possessed control over the use of the flatbed-commercial truck at the time when it permitted Linnebur to use the truck on or about July 26, 2019.

138.     Kalcevic permitted Linnebur to use the truck, which was under the control of Kalcevic, when it knew or should have known that Linnebur intended to, or was likely to, use the vehicle in such a manner as to create and unreasonable risk of harm to others.

139.     As a direct, proximate, and foreseeable result of the negligence of Kalcevic, Decedent sustained injuries.

140.     As a result of Kalcevic's negligent entrustment, Plaintiff has incurred damages as set forth above in Paragraph 112, *Supra*.

## NINTH CLAIM FOR RELIEF

### Respondeat Superior – Seven Farms

141.     Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

142.     At the time, date and place of the aforementioned accident, Trujillo was an employee and/or agent of Seven Farms.

143.     Upon information and belief, at the time, date and place of the aforementioned accident, Trujillo was driving the commercial tractor trailer while acting within the course and scope of his employment, as an agent, and/or with the authority of Seven Farms.

144.     The acts and/or omissions of Trujillo are by law deemed the acts and/or omissions of Seven Farms at the time of the incident pursuant to the doctrine of *respondeat superior*.

145.     As a direct, proximate, and foreseeable result of the negligence of Trujillo as an employee and/or agent of Seven Farms, Decedent sustained injuries.

146.     As a result of Trujillo's negligence, Plaintiff has incurred damages as set forth above in Paragraph 112, *Supra*.

## <u>TENTH CLAIM FOR RELIEF</u>

**Negligent Hiring, Training, Supervision Resulting in Wrongful Death Seven Farms**

147.     Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

148.     At all times material hereto, Trujillo served as an agent of and for and/or an employee of and for Seven Farms.

149.     Defendant Seven Farms owed Decedent a duty to exercise reasonable care in the hiring, supervision, and training of its agents and employees.

150.     Defendant Seven Farms breached its above-mentioned duty in failing to exercise reasonable care in its hiring, supervision, and training of Trujillo.

151.     As a direct and proximate result of Seven Farms' negligent hiring, training or supervision of Trujillo, Plaintiff has suffered non-economic losses as described above.

152.     As a direct, proximate, and foreseeable result of Seven Farms' negligent hiring, training or supervision of Trujillo, Decedent sustained injuries.

153.     As a result of Seven Farms' negligent hiring, training or supervision of Trujillo, Plaintiff has incurred damages as set forth above in Paragraph 112, *Supra*.


**ELEVENTH CLAIM FOR RELIEF**

**Negligence Per Se of Trujillo Resulting in Wrongful Death**

154.    Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

155.    When Trujillo operated the commercial tractor trailer in a careless and negligent manner, Defendant was in violation of applicable municipal ordinances and statutes of the State of Colorado, including, but not limited to: C.R.S. § 42-4-1402 – Careless Driving; C.R.S. § 42-4-704 – Vehicle Entering Roadway.

156.    Trujillo's actions caused the type of harm that these traffic laws were enacted to prevent, namely, the death of Decedent.

157.    Decedent was a member of the class for whose protection the above-mentioned statutes were enacted.

158.    The above-mentioned violations were the direct and proximate cause of the Plaintiff's injuries and damages as previously described.

159.    As a result of Trujillo's negligence, Plaintiff has incurred non-economic damages as set forth above.

160.    As a result of Seven Farms' negligent hiring, training or supervision of Trujillo, Plaintiff has incurred damages as set forth above in Paragraph 112, *Supra*.

## TWELFTH CLAIM FOR RELIEF

### Negligence of CDOT Resulting in Wrongful Death

161.     Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

162.     Defendant CDOT owed to Plaintiff a duty to use reasonable care in the maintenance of the roadways where the accident occurred.

163.     Defendant CDOT breached the above referenced duty, including, but not limited to, not increasing efforts to make a fatally dangerous intersection safer, directly and proximately causing Decedent's death.

164.     As a direct, proximate, and foreseeable result of the negligence of Defendant CDOT, Plaintiff sustained injuries.

165.     As a result of Defendant CDOT's breach of the aforementioned duties, Plaintiff has incurred non-economic damages as set forth above.

166.     As a result of CDOT's negligence, Plaintiff has incurred damages as set forth above in Paragraph 112, *Supra*.

WHEREFORE, Plaintiffs demand judgment against the Defendants in an amount which will fairly compensate the Estate of April Blackmon-Logan and her father for all injuries and damages as heretofore set forth, together with pre-judgment interest, litigation costs including expert witness fees, attorneys fees pursuant to § 1988, punitive or exemplary damages pursuant to §§ 1983 and 1988, and for such other and further relief as the Court may deem just and proper.

## JURY DEMAND

**PLAINTIFF DEMANDS A JURY TRIAL TO A JURY OF SIX**

Respectfully submitted on the 26th day of July 2021.

THE BOURASSA LAW GROUP

*/s/ Paula Bovo*
Paula Bovo, #38624
730 17th Street, Suite 320
Denver, CO 80202
Tel: (303) 331-6186
Email: pbovo@blgwins.com;
afrankin@blgwins.com

Plaintiff's Address
Kathy Lee
55494 East 28th Place
Strasburg, CO 80136