IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 21-cv-02021-PAB-MEH

ESTATE OF ARIL BLACKMON-LOGAN, by and through its personal representative
Kathy Ann Lee, and
CHRISTOPHER MISERLIAN,

      Plaintiffs,

v.

ADAMS COUNTY SHERIFFS DEPUTY CHAD JENKINS, in his individual capacity,
ADAMS COUNTY SHERIFF RICHARD REIGENBORN, in his official capacity,
KALCEVIC LAND COMPANY,
SEVEN T. FARMS, LLC,
PHILLIP TRUJILLO, individually,
ESTATE OF LEAH FORD, by and through its personal representative Twilight Hovey,
and
MICHAEL LINNEBUR,

      Defendants.

---

## ORDER

---

    This matter is before the Court on the Motion to Enforce Settlement and for Sanctions [Docket No. 63] filed by defendant Kalcevic Land Company ("Kalcevic") and the Adams County Defendants' Motion to Dismiss Third Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) [Docket No. 82] filed by Adams County Sheriff Richard Reigenborn and Adams County Sheriff's Deputy Chad Jenkins (collectively, the "Adams County Defendants"). Plaintiffs responded to the motion to enforce, Docket No. 84, and Kalcevic replied. Docket No. 88. Plaintiffs responded to the motion to dismiss, Docket No. 92, and the Adams County Defendants replied. Docket No. 94.

## I. BACKGROUND[1]

At approximately 11:22 p.m. on July 26, 2019, Deputy Jenkins stopped a flatbed commercial pickup truck owned by Kalcevic and driven by defendant Michael Linnebur, a Kalcevic employee, because of a defective front headlight.  Docket No. 73 at 5–6, ¶¶ 21–24, 31.  Linnebur was using the truck to take decedents April Blackmon-Logan and Leah Ford to and from Elitch Gardens in Denver, Colorado.  *Id.* at 5, ¶ 26.  Neither Blackmon-Logan nor Ford had a driver's license, and Ford had no experience driving a flatbed truck.  *Id.* at 5–6, ¶¶ 27–29.

Deputy Jenkins stopped the truck in an isolated, remote area near the intersection of Imboden Road and East 88th Avenue in Adams County, Colorado, where he knew or should have known there was limited or no cellphone service.  *Id.* at 6, ¶ 31.  There were no homes nearby and the area was almost completely dark.  *Id.*, ¶ 32.  When Linnebur stopped the truck, Deputy Jenkins requested Linnebur's driver's license and the vehicle's registration and insurance information.  *Id.*, ¶ 34.  Linnebur told Deputy Jenkins that he did not have his license and that the registration and insurance information were in the glove compartment.  *Id.*, ¶ 35.  Deputy Jenkins did not ask for Linnebur to produce the registration and insurance information, perhaps because he recognized Linnebur as someone he had stopped for other infractions during the preceding months.  *Id.*, ¶¶ 36–37.  Deputy Jenkins may also have been familiar with the truck as belonging to Kalcevic.  *Id.*

Deputy Jenkins ordered Linnebur out of the truck and informed him that he had

---

[1] The following facts, taken from plaintiffs' Third Amended Complaint and Jury Demand [Docket No. 73], are presumed to be true for purposes of resolving the motion to dismiss.  *See Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011).  The Court recounts only the facts that are necessary to rule on the motion.

been stopped due to a defective taillight.  *Id.* at 7, ¶¶ 39–40.  Deputy Jenkins either ordered Linnebur to fix the taillight or gave him permission to do so during the traffic stop.  *Id.*, ¶¶ 40–41.  When Linnebur did not repair the taillight to Deputy Jenkins's satisfaction, Deputy Jenkins told him that there was a warrant for his arrest for "failure to appear on a minor traffic violation," handcuffed Linnebur, and took him into custody in his patrol car.  *Id.*, ¶¶ 42–43.  Deputy Jenkins did not explain to Ford or Blackmon-Logan what he was doing or why he was arresting Linnebur.  *Id.*, ¶ 44.

Deputy Jenkins returned to the truck and instructed Ford and Blackmon-Logan how to engage the flashers and the high-beam lights to "override the defective headlights."  *Id.* at 8, ¶ 47.  He told them to disengage the high-beams if they saw oncoming traffic.  *Id.*, ¶ 48.  Plaintiffs allege that Deputy Jenkins did this to "create a deceptively false sense of security in both Ford and [Blackmon-Logan], to give them confidence that the defective flatbed-commercial truck was safe to drive – even at night with non-working headlights and taillights."  *Id.*, ¶¶ 49, 53.  Deputy Jenkins selected Ford to be the driver and then "ordered" Ford and Blackmon-Logan to drive the truck home.  *Id.* at 8–9, ¶¶ 49, 55, 58–59.  Deputy Jenkins, however, did not inspect the truck's condition, request either Ford's or Blackmon-Logan's driver's license, contact their families, request a safe vehicle to transport them, call for other assistance, warn them about the dangers of driving a defective truck at night in a dangerous location, or explain that disengaging the high-beams around oncoming traffic could mean that they would not see road signs, obstructions, or other vehicles.  *Id.* at 7–9, 11, ¶¶ 46, 50–54, 70–74.

Plaintiffs allege that, under Deputy Jenkins's orders, Ford "deliberately and intentionally operated the defective flatbed-commercial truck" in violation of state law, as

3

she was not licensed.  *Id.* at 9–10, ¶¶ 59–60.  Almost immediately after driving away, Ford performed a "reckless U-turn in the middle of the road."  *Id.* at 10, ¶ 61.  Deputy Jenkins initially followed Ford and Blackmon-Logan with Linnebur in custody, but then parked his patrol car a short distance away and met a fellow deputy for 20 minutes.  *Id.* at 10, 16, ¶¶ 62, 105.  Minutes later, while the deputies were still meeting, Ford approached the intersection of East 88th Avenue and Highway 79, which is an intersection with "little to no illumination and nearly invisible signage."  *Id.* at 10, ¶ 64.  According to plaintiffs, Ford recklessly entered the intersection without stopping at the stop sign and the truck was hit by a commercial tractor trailer driven by defendant Phillip Trujillo in the scope of his employment with defendant Seven T. Farms, LLC ("Seven Farms").  *Id.*, ¶ 65.  Both Ford and Blackmon-Logan were killed in the collision.  *Id.* at 10–11, ¶¶ 67–69.

Plaintiffs allege that Blackmon-Logan's death is "directly related" to the Adams County Sheriff's Department's "inadequate training of [its] employees" because the Sheriff's Department (the "Department") has no formal policy for deputies to confirm a driver's license status, inspect defective vehicles at traffic stops, and ensure the safety of drivers and passengers.  *Id.* at 12–13, ¶¶ 80–82.  Plaintiffs believe that the Department instructs deputies that it is unconstitutional for a deputy to request a passenger's identification at a traffic stop and that deputies may only request passenger information if they believe that the passenger is a victim or suspect in a criminal investigation.  *Id.* at 13, ¶¶ 83–84.  Plaintiffs assert that the Department's policies amount to "deliberate indifference to the rights of persons such as [Blackmon-Logan], by failing to acknowledge, recognize, or address the importance of not allowing unlicensed drivers to operate vehicles."  *Id.*, ¶ 85.

4

Plaintiffs bring eleven claims for relief: (1) violation of 42 U.S.C. § 1983 under the Fourteenth Amendment, (2) municipal liability against Sheriff Reigenborn, (3) negligence of Deputy Jenkins and Sheriff Reigenborn resulting in wrongful death, (4) negligence of Trujillo resulting in wrongful death, (5) negligence of Ford resulting in wrongful death, (6) negligence per se of Ford resulting in wrongful death, (7) negligence of Linnebur resulting in wrongful death, (8) negligent entrustment of Kalcevic resulting in wrongful death, (9) respondeat superior against Seven Farms, (10) negligent hiring, training, supervision resulting in wrongful death against Seven Farms, (11) negligence per se of Trujillo resulting in wrongful death.  *Id.* 14–28, ¶¶ 92–188.[2]

The Adams County Defendants move to dismiss the three claims against them for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  *See generally* Docket No. 82.

## II.  LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible."  *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)).

---

[2] Plaintiffs also brought a wrongful death claim against the Colorado Department of Transportation ("CDOT"), *see id.* at 28–29, ¶¶ 189–94; however, the parties stipulated to CDOT's dismissal from this lawsuit.  *See* Docket Nos. 95, 96.  The parties have stipulated that the first and second claims are brought solely by plaintiff Estate of April Blackmon-Logan (the "Estate") and that the third through eleventh claims are brought solely by plaintiff Christopher Miserlian.  *See generally* Docket No. 100.

Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (alterations omitted).  However, a plaintiff still must provide "supporting factual averments" with his allegations.  *Cory v. Allstate Ins.*, 583 F.3d 1240, 1244 (10th Cir. 2009) ("[C]onclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." (citation omitted)).  Otherwise, the court need not accept conclusory allegations.  *Moffet v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)).  If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim.  *Khalik*, 671 F.3d at 1191 (quotations omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  *Bryson*, 534 F.3d at 1286 (alterations omitted).

## III.  ANALYSIS

### A.  § 1983 Substantive Due Process Claim against Deputy Jenkins

The Estate's first claim alleges that Deputy Jenkins violated Blackmon-Logan's Fourteenth Amendment substantive due process rights.  *See* Docket No. 73 at 14–18,

6

¶¶ 92–117.  The Due Process Clause protects against "deliberately wrongful government decisions," *Uhlrig v. Harder*, 64 F.3d 567, 573 (10th Cir. 1995), when "a state . . . [actor] affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence."  *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001).  Thus, the general rule of the Due Process Clause is that government actors may only be held liable for their own acts, not for injuries or conditions outside of their control.  *See Denver Homeless Out Loud v. Denver*, 514 F. Supp. 3d 1278, 1301 (D. Colo. 2021) (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195–97 (1989)), *rev'd on other grounds by Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1263 (10th Cir. 2022).  "While state actors are generally only liable under the Due Process Clause for their own acts and not for private violence, . . . there are two recognized two exceptions to this rule: (1) the special relationship doctrine; and (2) the 'danger creation' theory."  *Uhlrig*, 64 F.3d at 572 (citing *DeShaney*, 489 U.S. at 196–97); *see also De Gomez v. Adams Cnty.*, No. 20-cv-01824-CMA-NYW, 2022 WL 1439113, at *8 (D. Colo. May 6, 2022) (noting the two exceptions and citing *Estate of B.I.C. v. Gillen*, 710 F.3d 1168, 1173 (10th Cir. 2013)); *Hovey v. Jenkins*, No. 20-cv-00976-LTB-KLM, 2021 WL 5763337, at *3 (D. Colo. Nov. 15, 2021) (noting the two exceptions);[3] *Schnurr v. Bd. of Cnty. Comm'rs of Jefferson Cnty.*, 189 F. Supp. 2d 1105, 1122 (D. Colo. 2001) (noting that the Tenth Circuit has gleaned two exceptions to the general rule that a state is not constitutionally obligated to protect individuals against private violence).  The Adams County Defendants argue that neither exception applies in this

---

[3] *Hovey* was brought by Ford's representative, Twilight Hovey, against Deputy Jenkins and the Adams County Sheriff's Department regarding these same events.  *See Hovey*, 2021 WL 5763337.  Hovey brought similar § 1983 and wrongful death claims that plaintiffs brought in this case.  *See generally id.*  The parties' arguments and authority in that case are similar to those in this case.

case.  *See* Docket No. 82 at 5–9.

### 1. *Danger Creation Liability*

The danger creation theory "provides that a government actor violates a plaintiff's substantive due process rights when he 'affirmatively acts to create, or increases a plaintiff's vulnerability to, danger from private violence.'"  *Hovey*, 2021 WL 5763337, at *3 (quoting *Currier*, 242 F.3d at 923).  "Under the 'danger creation' exception, a state actor may be held liable for the violent acts of a third party if the state actor 'created the danger' that caused the harm."  *Ruiz v. McDonnell*, 299 F.3d 1173, 1182 (10th Cir. 2002) (citing *Armijo v. Wagon Mound Pub. Schs.*, 159 F.3d 1253, 1260 (10th Cir. 1998)).[4]

The Tenth Circuit has held that, to state danger creation claim, a plaintiff must show, first, that the state actor made an affirmative act and, second, that the plaintiff's injury resulted from private violence.  *Gray*, 672 F.3d at 920; *Estate of B.I.C. v. Gillen*, 761 F.3d 1099, 1105 (10th Cir. 2014).  Once that threshold showing has been made, a plaintiff can make a prima facie case by showing that

> (1) the charged state actors created the danger or increased the plaintiff's vulnerability to the danger in some way; (2) the plaintiff was a member of a limited and specifically definable group; (3) the defendants' conduct put the plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) the defendants acted recklessly in conscious disregard of that risk; and (6) the conduct, when viewed in total, shocks the conscience.

*Ruiz*, 299 F.3d at 1182–83 (citing *Armijo*, 159 F.3d at 1262–63).

According to the Estate, Deputy Jenkins "deprived [Blackmon-Logan] of a liberty

---

[4] The Estate argues that the Tenth Circuit no longer requires that the violent acts be those of a "third party."  Docket No. 92 at 5.  Although that may be correct, as the Tenth Circuit has considered danger creation in the context of suicide, for instance, *see Gray v. Univ. Colo. Hosp. Auth.*, 672 F.3d 909, 918 n.6 (10th Cir. 2012), the distinction is irrelevant here.

interest" by "recklessly trying to create the impression of a safer vehicle" and ordering Blackmon-Logan ride in a "defective" vehicle, which created or increased Blackmon-Logan's vulnerability to the danger of "private violence" by Ford and Trujillo.  Docket No. 73 at 15, ¶¶ 95–98.  "By pulling over the defective commercial flat-bed truck," the Estate alleges, Deputy Jenkins distinguished Blackmon-Logan "from the general public," and thus she "was a member of a limited and specifically definable group."  *Id.*, ¶ 99.  The Estate alleges that it was reckless or careless for Deputy Jenkins not to continue to follow Ford and Blackmon-Logan to ensure their safety and the failure to follow them increased their risk of injury or death, violating the "foundation of law enforcement" and shocking the conscience.  *Id.* at 16, ¶¶ 104–07.  Deputy Jenkins allegedly "restrained [Blackmon-Logan's] personal liberty," which hindered her "freedom to protect herself from Ford."  *Id.*, ¶ 108.  The Estate also relies on its previous allegations that Deputy Jenkins "deliberately refus[ed]" to check for Ford's license or ensure the safety of the truck or environment.  *Id.* at 17, ¶ 115.

The Adams County Defendants argue that the Estate has not made the threshold showing that Blackmon-Logan's death was caused by an act of "private violence" because the Tenth Circuit has held that private violence "'typically connotes an act involving some degree of deliberateness' on the part of the private actor who directly causes the harm," yet there are no allegations that Trujillo was driving recklessly or deliberately.  Docket No. 82 at 6 (quoting *Gray*, 672 F.3d at 928–30).  In response, the Estate argues that the private violence in this case was not Trujillo's driving, but Ford's.  Docket No. 92 at 4–5.  However, there are no allegations that Ford actually drove through the stop sign with "some degree of deliberateness."  *See Gray*, 672 F.3d at 928.  Rather, plaintiffs allege that Ford "recklessly entered the intersection without stopping at

9

the stop sign, and the parties were hit by a commercial tractor trailer."  Docket No. 73 at 10, ¶ 65.

As the court explained in *Gray*, 672 F.3d at 928, "not just any private act will suffice" because "[t]he private act must be a violent one."  The court cited *Black's Law Dictionary*, which "defines violence as, among other things, 'physical force unlawfully exercised with the intent to harm.'"  *Id.* (quoting *Black's Law Dictionary* (9th ed. 2009)); *see also Johnson ex rel. Johnson v. Thompson*, 971 F.2d 1487, 1496 (10th Cir. 1992) ("Thus, the [state's] actions, while possibly negligent or even willfully indifferent or reckless," do not implicate the Constitution.); *Hovey*, 2021 WL 5763337, at *4 (expressing skepticism that Ford's acts could be deemed to be the cause of the harm for the private violence requirement).  Although, as the Estate notes, recklessness or deliberate indifference may be sufficient for a claim under § 1983, Docket No. 92 at 5 (citing *Medina v. City & Cnty. of Denver*, 960 F.2d 1493, 1496 (10th Cir. 1992) (explaining that "[p]ractically every court that has considered the issue has concluded that reckless intent may violate section 1983" and that the Tenth Circuit has "similarly concluded that recklessness states a claim under section 1983")), the Tenth Circuit has held that negligent driving is not an act of violence sufficient for the private violence element.  *Hernandez v. Ridley*, 734 F.3d 1254, 1259 (10th Cir. 2013) ("Here, Hernandez alleges Jose Jr. and Salvador were killed by Cooper's negligent driving, not by an act of violence.  Thus, he has not satisfied the private violence requirement.").  The Court finds that the Estate's allegations are insufficient to plausibly allege the private violence requirement based on Ford's driving.

However, even if the Estate can show the private violence element, the Adams County Defendants argue that it cannot show conduct sufficient to "shock the

conscience."  Docket No. 92 at 5.  The court in *Hovey* agreed and noted that the Tenth Circuit has held that level of conduct required shock the conscience "cannot precisely be defined, but . . . the 'shock the conscience' standard requires a high level of outrageousness, because the Supreme Court has specifically admonished that a substantive due process violation requires more than an ordinary tort."  *Hovey*, 2021 WL 5763337, at *5 (quoting *Uhlrig*, 64 F.3d at 574 (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992)).  In determining if a defendant's conduct shocks the conscience, courts are directed to consider "(1) the need for restraint in defining the scope of substantive due process claims; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting public safety."  *Ruiz*, 299 F.3d at 1184.

The court in *Hovey* found that Deputy Jenkins's "ordering" Ford and Blackmon-Logan to drive home "in a[n] unfamiliar, dark, rural area when one of the . . . truck's headlight[s] was not working," "in not ascertaining if they were licensed, and in failing to inspect the . . . truck for defects . . . could be deemed negligent and clearly, in retrospect, ill-advised."  *Hovey*, 2021 WL 5763337, at *5.  However, the court concluded that Deputy Jenkins's conduct did "not rise to the level of outrageousness to shock the conscience."  *Id.*  "Plaintiffs have failed to assert 'conduct that was so egregious, outrageous and fraught with unreasonable risk as to shock the conscience.'"  *Id.* (quoting *Liebson v. N.M. Corr. Dep't*, 73 F.3d 274, 275 (10th Cir. 1996) (quoting *Uhlrig*, 64 F.3d at 576)).  The Court agrees with the analysis in *Hovey*.  Although directing Ford and Blackmon-Logan to drive a malfunctioning truck that they did not know how to operate in an unfamiliar, rural area raised the risk that something catastrophic could happen to them, the Estate has not shown that Deputy Jenkins's conduct shocks the

conscience or that Deputy Jenkins disregarded risks that he knew about.  For instance, there is no allegation that Deputy Jenkins knew that the area was unfamiliar to Ford and Blackmon-Logan or that neither of them knew how to drive the truck.  Moreover, although Deputy Jenkins did not fully inspect the truck's condition, *see* Docket No. 73 at 8, ¶ 50, he did take the precaution of instructing Ford and Blackmon-Logan how to engage the flashers and the high-beam lights to "override the defective headlights." Docket No. 73 at 8, ¶ 47.

The Estate argues that Deputy Jenkins's conduct was reckless.  Docket No. 92 at 5–7.  However, even if Deputy Jenkins's conduct were reckless, as opposed to merely negligent, because he should have known of the need to determine whether Ford or Blackmon-Logan knew how to drive the truck and get to a safe area, or should have contacted their families or gotten a safe vehicle to transport them, the Tenth Circuit has held that merely reckless conduct is not sufficient to shock the conscience.  *See Uhlrig*, 64 F.3d at 573–74 (holding that shocking the conscience requires the plaintiff "do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power" and noting that "the Due Process Clause is not a guarantee against incorrect or ill-advised government decisions") (citations and alterations omitted).  Because the Estate alleges at most reckless conduct, which does not suffice for this element, *see id.*, the Court concludes that the Estate has not plausibly alleged a claim under the danger creation theory of liability.

### 2. *Special Relationship Liability*

Under the special relationship theory, "liability may attach to a state actor for the violence of a third party if the state restrained the plaintiff's personal liberty, and that restraint hindered the plaintiff's freedom to act to protect herself from the third party."

*Hovey*, 2021 WL 5763337, at *6 (citing *Ruiz*, 299 F.3d at 1182; *Armijo*, 159 F.3d at 1261 ("if the state restrains an individual's freedom to act to protect himself or herself through a restraint on that individual's personal liberty, the state may thereby enter into a 'special relationship' during such restraint to protect that individual from violent acts inflicted by others")).   "This doctrine protects individuals who involuntarily enter state custody and subsequently become reliant on the State, through its agencies and officials, to provide their basic human needs, paramount among those safety."   *Schwartz v. Booker*, 702 F.3d 573, 585 (10th Cir. 2012) (citations omitted).   "This involuntary, custodial relationship with the State imposes a continuing constitutional duty on state custodial officials to safeguard individuals in the State's care."   *Id.*   A custodial relationship is established when the state "assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual."   *Uhlrig*, 64 F.3d at 572.

In order for a plaintiff to plausibly establish special relationship liability, the plaintiff must show "involuntary restraint by the government," *DeAnzona v. City & Cnty. of Denver*, 222 F.3d 1229, 1234 (10th Cir. 2000), through "force, the threat of force, or a show of authority, with the intent of exercising dominion and control over the person." *Gray*, 672 F.3d at 924.[5]   For a custodial relationship to exist "the State's exercise of control must so restrain an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs."   *Id.* at 923 n.10 (citations, quotations, and alterations omitted).   "Although courts have struggled with the question of what restraint similar to incarceration or institutionalization is

_____

[5] Although the court in *Gray* described *DeAnzona* as an "opinion we have necessarily discounted as an incomplete application of *Graham* and *Uhlrig*," *id.* at 928 n.16, the court has not overruled the requirement that the special relationship theory of liability requires involuntary governmental restraint.   *See id.* at 924.

sufficient to give rise to a state's duty to protect, the 'Tenth Circuit has held that a plaintiff must show *involuntary* restraint by a government official in order to establish a duty to protect under the special relationship theory.'"  *Hovey*, 2021 WL 5763337, at *7 (citing *Schnurr*, 189 F. Supp. 2d at 1123) (emphasis in *Hovey*).  The Tenth Circuit has applied the special relationship doctrine "to prisoners, individuals involuntarily committed to mental institutions, and children placed in state-run foster care, but not to schoolchildren or children in state-run summer camps."  *See McClain v. Denver Health & Hosp. Auth.*, No. 17-cv-02238-PAB-NRN, 2018 WL 4698595, at *2 (D. Colo. Sept. 30, 2018) (citing *Gray*, 672 F.3d at 923); *see also DeAnzona*, 222 F.3d at 1234.

The Estate alleges that, by pulling over the truck, Deputy Jenkins "distinguished" Blackmon-Logan from the general public, which made her a "member of a limited and specifically definable group" and triggered Deputy Jenkins's "duty . . . to afford [Blackmon-Logan] some measure of peace and safety."  Docket No. 73 at 15, ¶¶ 97–99. The Estate also alleges that Deputy Jenkins "order[ed]" Blackmon-Logan to be a passenger in the truck with Ford.  *Id.* at 15–16, ¶ 103, 107.  The Estate asserts that, under these circumstances, Deputy "Jenkins restrained [Blackmon-Logan's] personal liberty," which "hindered [her] freedom to protect herself from Ford's actions."  *Id.* at 16, ¶ 108.  The Estate also alleges that, because of Deputy Jenkins's "restraint on [Blackmon-Logan's] personal liberty," Deputy Jenkins "entered into a special relationship during this restraint to protect [Blackmon-Logan] from violent acts inflicted by others," and this "special custodial relationship . . . was sufficient enough to trigger an affirmative duty to provide protection" to Blackmon-Logan.  *Id.*, ¶¶ 109–10.  The Estate insists that Deputy Jenkins's "involuntary restraint" of Blackmon-Logan "was done through his threat of force and show of authority when he arrested Linnebur in plain sight" and that he

acted "with the intent of exercising dominion and control over" Blackmon-Logan, which "deprived" her of "the freedom to act on her own behalf." *Id.* at 17, ¶¶ 111–12.

The Adams County Defendants argue that these allegations are insufficient to meet the special relationship exception because the level of control that Deputy Jenkins's allegedly exercised "did not rise to the level of a custodial relationship." Docket No. 82 at 8.  The Court agrees with the Adams County Defendants.  As the Court found in *Hovey*, the facts in this case "do not rise to the level of an involuntary restraint." *Hovey*, 2021 WL 5763337, at *8.  Assuming the truth of the Estate's allegations that Deputy Jenkins "ordered" Blackmon-Logan to ride with Ford in the truck and made a show of force in arresting Linnebur in front of the decedents, "such allegations to do not rise to the level of an involuntary restraint" of Blackmon-Logan "sufficient to constitute a custodial relationship." *Id.*  There are no facts that "the State's exercise of control" over Ford or Blackmon-Logan "so restrain[ed] [their] liberty that it render[ed] [them] unable to care for [themselves]." *See Gray*, 672 F.3d at 923 n.10.

The court in *Hovey* noted that the state's affirmative duty to protect "arises not from the State's knowledge of the individual's predicament, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.* (quoting *Schnurr*, 189 F. Supp. 2d at 1123 (quoting *DeShaney*, 489 U.S. at 200)).  The cases that the court in *Hovey* reviewed show that the allegations in this case do not rise to the level of a plausible special relationship claim.  For instance, in *Seamons v. Snow*, 84 F.3d 1226, 1235–36 (10th Cir. 1996), *reversed in part on other grounds*, 206 F.3d 1021 (10th Cir. 2000), the court held that, "[i]f the state takes a person into custody or holds him against his will, the state assumes some measure of a constitutionally mandated duty of protection," but "[c]ompulsory attendance laws for public schools . . . do not create an

affirmative constitutional duty to protect students from the private actions of third parties while they attend school."  In *Armijo*, 159 F.3d at 1261, the court held that, even if a public school student "confined in [an administrator's] car during [a] drive home from school . . . constituted a custodial relationship," "that relationship ended once [the student] exited the car and ran to his house because at that point he was no longer under any involuntary restraint by a school official."  The court in *Armijo* held that "[t]he only 'restraint' imposed upon [the student] after his removal from school was [a] directive that he not return to school that day.  Otherwise, [the student] was free to do whatever he wanted, including voluntarily leaving his house." *Id*.  The court concluded that this "does not rise to the same level of involuntary restraint as arresting, incarcerating, or institutionalizing an individual." *Id*.  *Hovey* also cited *Mason v. Barker*, 977 F. Supp. 941, 943 (E.D. Ark. 1997), which involved an allegation that a police officer ordered a mother to drive herself and her children out of town, even though the officer knew that the mother was clearly under the influence of drugs.  The court held that the officer's actions "increase[ed] the risk of danger," but "do not suggest that [the mother] was in custody in a manner that would deprive her of her ability to care for herself or her children." *Hovey*, 2021 WL 5763337, at *8 (quoting *Mason*, 977 F. Supp. at 943).

The Court finds the analysis in *Hovey* to be persuasive, given the similar allegations and identical claims in that case, and concludes that, in light of the Tenth Circuit's decisions in *Seamons* and *Armijo*, the Estate's allegations are insufficient to plausibly allege that Deputy Jenkins held Blackmon-Logan in a custodial relationship. Thus, the Estate has not plausibly stated a Fourteenth Amendment claim under the special relationship theory of liability.  The Court accordingly will grant the Adams County Defendants' motion to dismiss the Estate's first claim.

### 3. Qualified Immunity

The Adams County Defendants argue that they are entitled to qualified immunity because the alleged constitutional violation was not clearly established when the events in this case occurred. Docket No. 82 at 9–10. "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To overcome a qualified immunity defense, "the onus is on the plaintiff to demonstrate '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

As they did in *Hovey*, the Estate argues that the Tenth Circuit in *Uhlrig*, 64 F.3d at 572, "noted that the holding" in *Wood v. Ostrander*, 879 F.2d 583, 586 (9th Cir. 1989), as a "classic case of state actors creating a danger so as to give rise to §1983 liability." Docket No. 92 at 7–8; *see also Hovey*, 2021 WL 5763337, at *6. In *Wood*, "police officers placed plaintiff in danger by impounding her car and abandoning her in a high

crime area at 2:30 a.m., thereby 'distinguish[ing] Wood from the general public and trigger[ing] a duty of the police to afford her some measure of peace and safety.'" *Uhlrig*, 64 F.3d at 572 (quoting *Wood*, 879 F.2d at 589–90).

The facts of *Wood*, however, are distinguishable. First, in *Wood*, the officer left the plaintiff in a high-crime area, while here, the Estate does not allege that the area where Blackmon-Logan and Ford were left was a dangerous high-crime area. Second, in *Wood*, the court noted that "[t]he temperature was fifty degrees and Wood was wearing only a blouse and jeans" and, "after walking one-half block toward her home, which was five miles away, and having turned down rides offered by three or four strangers, she accepted a ride with an unknown man," who "took Wood to a secluded area and raped her." 879 F.2d at 586. None of these facts appear in this case. Instead, as the Adams County Defendants note, Deputy Jenkins left Blackmon-Logan and Ford with the truck, which could have transported them home or somewhere else. Docket No. 94 at 6–7.

Moreover, as the Adams County Defendants explain, after *Uhlrig* and *Wood*, the Tenth Circuit decided *Anderson v. Worstell*, 492 F. App'x 913, 914 (10th Cir. 2012) (unpublished), in which the court reversed the denial of qualified immunity for police officers who "arrested the driver of the vehicle for driving while intoxicated, and notwithstanding [the driver's] extreme and apparent level of intoxication, . . . ordered him to leave the scene," yet took "no steps to take him into protective custody or otherwise ensure his safety." "Later, while attempting to walk home, [the driver] was struck by a vehicle and sustained serious injuries." *Id.* The court explained that the driver "point[ed] to no Supreme Court or Tenth Circuit authority subsequent . . . which would indicate the due process rights he asserts were violated have become clearly established. To the

contrary, *Gray* indicates its highly unlikely the conduct which forms the basis of [the driver's] complaint amounts to a constitutional violation."  *Id.* at 917.

The court in *Anderson* cited to *Hillard v. City & Cnty. of Denver*, 930 F.2d 1516, 1517–18 (10th Cir. 1991), as a substantially similar case.  There, a heavily intoxicated passenger was robbed and sexually assaulted after police officers removed her from a vehicle after the driver was arrested for drunk driving.  *Id.* at 1517.  The court found no clearly established constitutional right that was violated in that case.  *Id.* at 1519.

The Supreme Court has "repeatedly told courts not to define clearly established law at too high a level of generality."  *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (citing *al-Kidd*, 563 U.S. at 742).  "It is not enough that a rule be suggested by then-existing precedent; the 'rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"  *Id.* (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (quotation omitted)).  *Wood* is not sufficiently analogous to the facts in this case for a reasonable officer to have known that his conduct was unlawful.  Thus, the Court finds that Deputy Jenkins is entitled to qualified immunity.[6]

### B.  § 1983 Municipal Liability Claim against Sheriff Reigenborn

The Estate's second claim is for municipal liability against Sheriff Reigenborn.

---

[6] The Estate argues that it should be able to conduct discovery on qualified immunity.  Docket No. 92 at 14–15.  This argument displays a misunderstanding of the doctrine's purpose.  "The defense by a public official based on a claim of qualified immunity, if successful, protects the official both from liability as well as from the ordinary burdens of litigation, including far-ranging discovery."  *Workman v. Jordan*, 958 F.2d 332, 335 (10th Cir. 1992) (citing *Harlow,* 457 U.S. at 817–18).  Moreover, the Estate may not request a stay, expedited discovery, or any other relief through a response to a motion to dismiss.  *See* D.C.COLOLCivR 7.1(d) ("A motion shall not be included in a response or reply to the original motion.  A motion shall be filed as a separate document.").

Docket No. 73 at 18–21, ¶¶ 118–31.  The Estate alleges that, "[t]o the extent [Sheriff] Reigenborn delegated final policy making authority for traffic stop procedures, they are [sic] liable for the unconstitutional policies and customs employed by [Deputy] Jenkins pursuant to their [sic] nondelegable duties of providing public safety."  *Id.* at 19, ¶ 120. Additionally, the Estate alleges that Sheriff Reigenborn "knew he lacked any official policies regarding confirming the licensure status of parties in a traffic stop" who may have to operate a vehicle and "how a traffic stop involving a defective vehicle should be executed."  *Id.*, ¶ 121.

In order governments may not be sued under § 1983 on a theory of respondeat superior.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978).  Instead, local governing bodies can be sued directly only where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Id.* at 690 (footnote omitted).  "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Id.* at 694.

In order to state a claim for municipal liability under § 1983 for the actions of a municipal employee, a party must allege sufficient facts to demonstrate that it is plausible (1) that the municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation.  *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004). The Estate argues that the fifth form of municipal liability, a failure to train police officers, apply here.  Docket No. 92 at 12–14.

A municipality cannot be held liable under § 1983 for the allegedly unconstitutional actions of its employees if those actions were not in fact unconstitutional.  *See Trigalet v. City of Tulsa*, 239 F.3d 1150, 1154 (10th Cir. 2001); *see also Webber v. Mefford*, 43 F.3d 1340, 1344–45 (10th Cir. 1994) ("A claim of inadequate training, supervision, and policies under § 1983 cannot be made out against a supervisory authority absent a finding of a constitutional violation by the person supervised.").  Because the Estate failed to plausibly allege that Deputy Jenkins committed a constitutional violation, the Estate has necessarily failed to plausibly allege that Sheriff Reigenborn is liable under *Monell*.  *See Trigalet*, 239 F.3d at 1155–56 ("Thus, even if it could be said that Tulsa's policies, training, and supervision were unconstitutional, the City cannot be held liable where, as here, the officers did not commit a constitutional violation."); *see also Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997) (holding that a plaintiff must show direct causal link between municipal action and deprivation of federal rights in order to hold municipality liable under § 1983); *Jiron*, 392 F.3d at 419 n.8 ("[W]hen a finding of qualified immunity is based on a conclusion that the officer has committed no constitutional violation – i.e., the first step of the qualified immunity analysis – a finding of qualified immunity *does* preclude the imposition of municipal liability.").  Accordingly, because the Estate failed to allege that there was an underlying constitutional violation, it necessarily cannot plausibly allege municipal liability against Sheriff Reigenborn.  *See Hovey*, 2021 WL 5763337, at *9 ("Because I have found no underlying constitutional deprivation, by concluding that the Estate has failed to state a claim for § 1983 liability against Deputy Jenkins for violating Ms. Ford's due process rights, I agree with Adams County that the Estate's claim against it for failure to train likewise fails to state a claim upon which relief

can be granted." (citing *Collins*, 503 U.S. at 120 (noting that municipal liability requires a preliminary showing of a predicate constitutional deprivation); *Ireland v. Jefferson Cnty. Sheriff's Dep't*, 193 F. Supp. 2d 1201, 1227 (D. Colo. 2002) (municipal liability under § 1983 requires an underlying constitutional deprivation)).

### C.  Remaining State-Law Claims

The remaining claims, which are apparently only brought by Miserlian, are state-law claims for negligence, wrongful death, and respondeat superior against other defendants.  Docket No. 73 at 21–28, ¶¶ 132–88.[7]

Although no party has moved to dismiss these claims, the Court may consider supplemental jurisdiction *sua sponte*.  *See, e.g.*, *Foltz v. Chase Home Fin., LLC*, No. 14-cv-01581-PAB-CBS, 2015 WL 849214, at *1 (D. Colo. Feb. 25, 2015) (citing *Citizens Concerned for Separation of Church & State v. City & Cnty of Denver*, 628 F.2d 1289, 1297 (10th Cir. 1980)).  The Court may exercise supplemental jurisdiction over state law claims if there is a jurisdictional basis for doing so; however, 28 U.S.C. § 1367(c)(3) provides that a district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."  The Tenth Circuit has instructed that, "if federal claims are dismissed before trial, leaving only issues of state law," courts should "decline to exercise pendent jurisdiction . . . absent compelling reasons to the contrary."  *Brooks v. Gaenzle*, 614 F.3d

---

[7] Respondeat superior is not a separate claim.  *See, e.g.*, *Smith v. Williams*, No. 06-cv-00436-LTB-GJR, 2007 WL 174378, at *8 (D. Colo. Jan. 19, 2007) ("Smith states respondeat superior as a separate claim, but in fact it is a theory of liability whereby an employer may be liable for the conduct of an employee."); *Ayon v. Gourley*, 47 F. Supp. 2d 1246, 1251 (D. Colo. 1998) ("[A]lthough the terms 'respondeat superior' and 'ratification' are included in the Amended Complaint under the heading 'Joint Liability Claims,' neither respondeat superior nor ratification constitute a separate claim."), *aff'd*, 185 F.3d 873 (10th Cir. 1999) (Table).

1213, 1229–30 (10th Cir. 2010) (brackets, internal citations, and internal quotation marks omitted).  This rule is consistent with "[n]otions of comity and federalism," which "demand that a state court try its own lawsuits."  *Id.* at 1230 (quoting *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995)); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) (holding that, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well" and that, "[w]hen all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims"); *Hovey*, 2021 WL 5763337, at *9 ("[B]ecause I have dismissed all the federal claims over which this Court has original jurisdiction, I decline to exercise supplemental jurisdiction over this state law claim pursuant to 28 U.S.C. § 1367(c)(3).").[8]  Accordingly, the Court will dismiss Miserlian's state-law claims without prejudice.  *See* Colo. Rev. Stat. § 13-80-111 (permitting claims properly commenced within the statute of limitations to be re-filed if involuntarily dismissed because of lack of jurisdiction); *Artis v. District of Columbia*, 138 S. Ct. 594, 598 (2018) (holding that 28 U.S.C. § 1367(d) tolls the statute of limitations for state law claims asserted under § 1367(a) during the pendency of the federal litigation in which such claims are brought and for thirty days following involuntary dismissal of those claims on jurisdictional grounds).

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the Adams County Defendants' Motion to Dismiss Third

---

[8] The Adams County Defendants argue that plaintiffs' wrongful death claim against them is barred by the Colorado Governmental Immunity Act.  *See* Docket No. 82 at 12–15.  Because the Court has dismissed plaintiffs' third claim, the Court does not consider this argument.

Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) [Docket No. 82] is **GRANTED**.

It is further

      **ORDERED** that plaintiff's first and second claims are **DISMISSED with**

**prejudice**.  It is further

      **ORDERED** that plaintiff's remaining claims are **DISMISSED without prejudice**.

It is further

      **ORDERED** that the Motion to Enforce Settlement and for Sanctions [Docket No.

63] is **DENIED as moot**.[9]  It is further

      **ORDERED** that this case is closed.


      DATED August 24, 2022.


                   BY THE COURT:


                   PHILIP A. BRIMMER
                   Chief United States District Judge

---

[9] The Court's dismissal of the claim against Kalcevic for lack of supplemental jurisdiction moots Kalcevic's motion to enforce a settlement agreement regarding that claim and for sanctions against plaintiffs' counsel for conduct in settlement discussions. Accordingly, the Court denies Kalcevic's motion as moot.